My name is Andy McHugh. Mike Wilson and I represent Mary Lou McClune who appeals the district court's grant of summary judgment in favor of her automobile insurer Farmers Insurance Company. Let me just say I apologize for being late. I stepped out briefly during the last argument. In entering summary judgment for farmers, the district court impermissibly resolved multiple factual issues in favor of the move at farmers to find that Mary breached the cooperation clause of her auto policy by declining to produce a duplicate medical authorization and medical records that she had previously produced and to agree to a set for an examination under oath at some unspecified future date after farmers recollected her medical records and had them reviewed by an expert. Farmers first requested those things on April 17, 2018 which was well after farmers had already determined there was coverage for Mary's claim back on November 7, 2017 and offered to settle the claim and settlement negotiations had ceased well before April 17. They had ceased, in fact, as of March 29, 2018 by the expiration of our time-limited settlement demand and by the expiration of the farmers' own self-imposed deadline to respond to our demand. The district court further found, strike that, the district court further erroneously predicted that the Missouri Supreme Court would endorse the forfeiture of Mary's UIM claim under those circumstances and that contrary to subtle Missouri law as shown by at least four, probably more, Supreme Court cases, foremost among them Weaver v. State Farm and Trezner v. State Farm and Weaver correctly notes that, you know, these forfeiture clauses and insurance policies are intended to protect the insurance company against fraudulent claims or claims that have no merit. They are not intended to be some sort of a technical escape hatch by which they avoid their obligations of the policy holder and that is exactly what happened here. From a legal standpoint, it's our position there was no duty for us to cooperate under the policy after March 29 of 2018 because farmers had by then breached the policy. For one thing, this bilateral rotator cuff tears and originally Mary had a right rotator cuff tear and while she was convalescing, taking care of the right, why she overused her left rotator cuff and it ended up torn. So as that all played out, farmers had offered originally for the right shoulder only $2,500. That was on top of the $100,000 that we had collected from the liability carrier. So farmers valued the right rotator cuff at $1025. Yet when we made the claim for the left rotator cuff, they offered us only something, and I'm using round numbers now, something in the neighborhood of $4,500, which of course makes no sense whatsoever. And even farmers had set its reserve at $10,000. So they had determined that the value of this claim was worth well more than they ever offered, but they did not offer that money to us. Not that we would have taken $10,000, but it simply demonstrates they were in breach. Do you have any law that stands for the proposition that what somebody sets as a reserve may be used to establish a value to show some sort of misconduct or bad faith on the part of the insurance company? Because that seems pretty far out there to me. Yes, sir. There is a case cited in our brief. It's called TRIPP, T-R-I-P-P, and it is a case from South Dakota construing its vexatious refusal statute. And among other things, the court went through and that the insurance company there had valued the claim at $50,000, but did not offer that amount and that that was evidence of unreasonable handling of the claim. But there are all kinds of reasons for establishing a reserve on a case that have nothing to do with the case itself, including tax considerations. I don't disagree with you one bit. I don't disagree with you. Once again, though, I'll come back to they valued the right at $1,025 and the left, you know, at $45. So they were in breach of the contract, you know, delaying payment on something like that breaches the contract, which excuses us from a duty to perform. Over and over, the court said, well, Mary Bant remained bound by the cooperation clause that farmers hadn't rendered a decision on the claim. That's contrary to the record. They told me in November of 2017, we've completed our investigation. After I gave them everything they asked for and after they confirmed it, the court said, well, they needed to reopen the investigation because of the size of the claim as set forth in our March 12, 2018 demand. Also contrary to the record. Previously, we had demanded $500,000 in my March 12, 2018 demand. It was only for 450. I lowered it based on their suggestion that, you know, they wanted to negotiate, put the time limitation on it. So that was the least amount of difference between the parties. So the court just has that wrong. The court said, well, they needed to reinvestigate the claim. If you read carefully Kyle's deposition testimony, he said he sent it out to his lawyers to fortify his position in the event of future litigation that's in his deposition. And we cite it. The court says at least two or three times that the request for the EUO and these duplicate medical records was made during continued settlement negotiations. That's not true. The settlement negotiations were over as of March 29 and they didn't ask for this stuff until April 17 when farmers lawyers got it. The court said that, well, you were implicitly suggesting that there should be further negotiations. Well, you can't implicitly is contrary to the express terms in this instance of our offer to settle the case. So the court just one, two, three, four, all of the premises upon which this duty to cooperate is based, they're wrong. And we're entitled the benefit of the reasonable inferences and the favorable evidence and farmers is not. Farmers also has to prove that it was prejudice. Well, farmers wasn't prejudiced one bit. They had all the information they needed back in November to determine there was coverage, which they did, and assess the value of the claim, which it did. They didn't need this stuff that they asked for and sort of that proof is to some degree in the pudding. They asked for a duplicate medical authorization. They never used the medical authorization we had given them. They asked for medical records. They called out specific records in that April 17 letter to me, they called out specific records they wanted, which are the exact same records Ken Collet asked me for back in July, and which I had supplied to him in October. And if you put those two things up side by side, you can see that's exactly what happened. Over and over the court says, well, they needed additional documents. They needed additional records. What did they need? There's not a council. Why wouldn't it? Why wouldn't the insurer be entitled to have an opportunity to address directly the person who's claiming their responsibility for losses in order to just assess the credibility of the claim? They would. The insurance company would, Judge, had they timely requested that. But they didn't. They don't get to simply delay the disposition of the claim by relying on these policy provisions. They could have, farmers could have asked for examination under oath back in July of 2017. We first raised the issue, and at any point up through March 12 or arguably even up to March 29. But instead, they let our deadlines go by, and then they come back and say, oh, now we want to do this to delay the disposition of the claim even further. So this whole notion- Counsel, is there anything in Missouri law that indicates your designation of a deadline alters the contract's statements about what can be requested or required for compliance? I don't think there's anything dead on point about it, but it's, you know, Hornbuck law that I'm entitled to make a conditional offer to resolve a claim, and that's what I did, and they didn't satisfy the condition. Then what's happened is the conditional officer has been rejected. That doesn't alter the terms and conditions of the underlying contract of insurance, does it? Well, I'm not bound by that anymore after they've rejected my efforts to settle the case, and after they've breached the policy once again by not paying the claim or at least offering as much money as they themselves believe the claim to be worth. Otherwise, this could just go on indefinitely. I mean, basically, I'm penalized for trying to resolve the case short of litigation. So I don't think they can do that, not to mention they weren't prejudiced. They had everything they needed, and they have not identified anything in particular that they claim that there's a bunch of conclusory language in their brief about it was critical that we talk to her, et cetera, et cetera. It's an underinsured motorist case, okay? It was underinsured, and they had no expert, sir. Well, isn't there still an underlying fact question about the left shoulder injury and whether or not there were preexisting conditions or anything else going on with that shoulder and what activities? This is a rather elderly woman, and the circumstances were what they were. I don't see this as just cut and dry without any reason to talk to her. I mean, I get where the right shoulder, there's not a whole lot to talk about, but that left shoulder seems to me to have both questions about etiology and other contributing factors. I don't disagree with that, Judge. Our point is they had plenty of that months and months before they sent it out to their lawyers. In addition to which, Mary Lou's not going to be able ... All of that stuff's in her medical records. I mean, really, to your point, Judge, if those things were important, and if the situation, as Mary had an opportunity to explain it was important, you'd expect to find, now that we're on appeal, then a citation to her deposition that says, oh, we had all these critical questions. Here's what we needed to know, and it's not there because that whole examination is simply a smoke screen. Weaver talks a little bit about that in the context of an affidavit, all of the conclusory type things. The last thing that I want to say on the front end of my argument is that farmers did not establish, and this is what I'm really talking about, the exercise of reasonable diligence to secure this information. They had every opportunity months and months before April 17 to do so, and they simply didn't do it. That's one of the things they have to prove in order to rely on this alleged cooperation clause. In the cases I'll say, whether they exercised reasonable diligence is a question of fact. The district court's opinion doesn't even address that issue. There is no finding that farmers found, strike that, that farmers exercised reasonable diligence, and absent that, summary judgment is simply inappropriate. With the court's permission, I'd like to save my last two and a half minutes for rebuttal. Thank you, Mr. McHugh. Mr. Wolfe. Thank you, Your Honors. If it pleases the court, we respectfully, on behalf of Farmers Insurance Company Inc., request that the court affirm the judgment of Judge Sachs in the lower court, granting summary judgment for farmers. Cooperation conditions and insurance policies like the one we have here have long held to be valid and enforceable in the state of Missouri and federal courts. They are not mere formalities and have an essential purpose in the evaluation and settlement of insurance claims for insurers. In Wiles, the eastern district of Missouri, stated, they enable the insurance company to possess itself of all knowledge and all information as to other sources of knowledge in regards to facts material to their rights to enable them to decide upon obligations and to protect them against false claims. In the Roller case, the American Modern, it was stated, this is very recent in 2015, an insurer has the right to, quote, complete investigation of the claim, including examinations, and the insurer's failure to assist in the investigation precludes coverage. Now, that's exactly- Mr. Wolfe, why wouldn't a person be reasonable in thinking that when you tell them that you have completed your investigation, that that's exactly what that even though you list that you have the right to request an EUO, if you haven't done so and you tell them you're done, why doesn't that mean that? Your Honor, I think what has happened here is they've latched onto a word that was used during continued negotiations of a claim. At that point, you're referring to the November 7th, 2017 letter from Ken Kyle, where he says this letter is to advise that we have completed the evaluation. So, what does that mean? They evaluated the records that were submitted to that date and made an offer. Now, the lower court correctly found, in looking at the totality of the circumstances, on February 26, 2018, there was no response to that offer. So, what did Ken Kyle do? He submitted another letter and he asked to follow up on that and he says, if additional treatment has been received, please provide copies of the applicable medical bills and records or provide a signed medical authorization and list all providers. I would be more than happy to request the copies for you. These continued settlement discussions went on. We can't draw the line and say, okay, we've made an offer on a claim. There would be no settlement discussions at all. If every time somebody made an offer, the insurance company made an offer, it terminated the claim. All duties under the cooperation provisions, all duty in the policy ceased at that point because they made the first offer in continuing settlement discussions. I don't think that's the law. They don't cite to any cases that say that and I think it would completely derail the process of negotiations of insurance claims if insureds were no longer held responsible for the cooperation conditions under the policy because the insurance company made an offer saying, based on the records we have right now, we've completed our investigation, here's our offer. That's just simply not the law. And it's not, it doesn't report with the facts of this particular case where they continue to make negotiations and offers back and forth. And then, what about the argument that's been advanced that the question of whether or not there's been a material breach such that forfeiture is the appropriate remedy is a heavily fact-burdened question. And if reasonable persons can disagree as to whether that's happened, it ought to be submitted to the jury under Missouri law. And of course, there are cases that do that. And so, the question is, why are they wrong on that? That this really is something that Judge Sachs should have instructed the jury on and afforded the jury the opportunity to find the facts and then apply it to the law. Yeah, that's a very interesting point. Plaintiff spends much of his time kind of raising what I call immaterial factual disputes, but they argue that it was improper for Judge Sachs to have determined reasonable diligence and substantial prejudice as a matter of law. Okay, they said that this is a fact question. But I think it completely contradicts Missouri's Supreme Court and Columbia Casualty Company v. Higher Holdings. And I point to page 272 of that opinion. And they kind of go through this analysis because the plaintiff in this case decided to kind of general law saying it's typical for this to be a fact question. In the Higher Holdings opinion, the Missouri Supreme Court held otherwise. It is typically, and it acknowledged, it is typically a question for a fact finder whether an insurer provided notice to the insurer within a reasonable time and whether the insurer suffered substantial prejudice as a result. But when the facts bearing on the issue are undisputed, which is what we have here, as they are in this case, in which both sides asserted a right to summary judgment on the premise that there is no undisputed facts that would preclude such a judgment, then the notice issues reflect questions of law. So it's exactly the situation we have here as what was in play in the Missouri Supreme Court in that Higher Holdings case. The plaintiffs in this case said, hey, we're entitled to summary judgment on your non-cooperation defense, because the facts are here. All the letters are undisputed. The letters were sent. They were received. The question is, as a matter of law, what is the legal significance of these facts? All right. And under the Higher Holdings case, it's for the judge can decide these things when there's no factual issue. For instance, if they said, hey, the letter that was sent by Mr. Wolf in April of 2017, we never got it. We didn't know anything about that letter. We didn't know. Then it goes to a fact question. Did they receive the letter? Did they not receive the letter? Those types of issues. But they just simply, there were no disputes of facts in this regard. The same point to be made. Go ahead. I'm sorry. I'm just thinking, one of the questions that is a mixed question of fact and law is reasonable diligence in this case, right? And I get where you're saying the facts are undisputed. But apparently, at some point, there were enough facts disputed that the claims history and the claims management history was made available to Judge Sachs to review in camera, who then decided which parts of it, if any of it, were ever going to be produced. And it kept kicking around in my mind. And it's just like, should Judge Sachs, having now seen the entire claims history that none of us have seen, I mean, maybe you have, but the rest of people on this argument have never seen it, should he still have been the judge making the decision at that point? Yeah. That's not an issue on appeal that was raised. But I think that the issue there was what was privileged and not privileged. We submitted letters that we'd sent to our client as being privileged in the privilege log and things after a certain point. And that was what he was trying to decide, whether they had access to this information after a certain date, when there was a dispute about whether a lawsuit was going to be filed. You know, the judge, you know, I kind of take issue with the point that counsel made that the judge didn't make any ruling at all on reasonable diligence. Judge Sachs found plaintiff's contention that the request was untimely, is unpersuasive, and is supported by no authority. Rather, the claim is essentially of an irrevocable waiver or estoppel to reopen the investigation. They've cited to actually no case law at all that says that farmers, because it made an offer and said we've, you know, concluded our investigation, can't reopen it. In fact, that is completely contradicted by the Northrop case. Counsel, this is Joe Smith. What's the limit on that? It seems like the insurance company is in complete control to continue to insure it for an interminable period by simply saying we're not done yet. Sure. Well, I think the facts don't support that. We're talking about a period of months here where this is all percolating. All right. So, the facts are this is not that case. And so, yes, could there be some extreme over here where the insurance company waits a year or two and then makes the request after the initial, yeah, you could come up with a factual scenario like that, but it's not this case. Right. Just like I could come up with a factual situation where I could say, you know, we want to prevent this scenario. We're right out of the gate. The plaintiff's attorneys make or the claimant's attorneys make a demand for the policy limits. It's not accepted. And therefore, we've breached the policy. And therefore, they never have to do anything with cooperation, anything with any of the conditions of the policy. That's the rule of law that they're advocating for in this case, that if you don't accept our demand, then the insurance company has no rights under the policy anymore. You've been the first to breach. And that's not what the law is. So, I guess there's two different extremes here. You know, I think the facts don't support that we didn't act diligently at all. In fact, you know, you have correctly pointed out that there was this real issue about the left shoulder. All right. And the factual issue was so important to the claims professional, Ken Kyle, because the facts that were presented April 2nd, 2015, the records from her primary care doctor said that she had resolved the problems with the right shoulder and there was no indication at all that there was a problem with the left shoulder. That's what the record said. This is what farmers had. And then in reading the records, they find out that there was a June 25th, 2015 MRI of the left shoulder. But they don't have any records at all. And now they've made the claim for the left shoulder. They have no records at all as to when this problem started. You know, what's the issue? And they're saying it's an overuse. But the April 2nd, 2015 records didn't show that there was some kind of problem going on with the left shoulders. Just the right shoulder had resolved. Nothing on the left. So, there was this real factual issue. And then October 29th of 2015, Dr. Mercola, her orthopedist, you know, is not able to find a tear in the left shoulder on the MRI. So, this is what we're looking at. This is what farmers are looking at during this time period. And so, when they get this demand for the left shoulder, they're asking for the records. And so, what does Penn Kyle do? On July 26th of 2017, he says, please produce treatment records for Ms. McClune's primary care physician, Dr. Kathleen Eubanks-Mang. She's the one that ordered the left shoulder MRI. So, it was very important for farmers to get these primary care records regarding this MRI. And this issue with her then failing to produce the MRI, or I'm sorry, the records from Dr. Mang regarding the left shoulder MRI permeates through it. They were never produced ever. And that's... Counsel, were those records available to you through medical releases already provided? They, well, so that's a whole other issue. Okay. So, regarding the medical records issue, that medical release from 2015, three years before the situation's going on, was part of what's called a medical payments claim. All right. And a medical payments claim is no fault coverage. You give us the bills, we send you a check. All right. And so, they did execute as part of the medical payments claim that release a couple years before this treatment was even provided. That was the testimony in the case was that medical payments claim is a separate coverage that's not part of the claim file for the UIM exposure. So, there's, think of it this way, you know, I've got a brown folder here and we call it the medical payments folder, the claim, and then we've got the UIM claim folder over here. Now, could he have accessed the UIM or the medical payments claim? He could have, no doubt, but that release was not in the UIM claim folder. This is essentially... Well, that seems to be more of a problem of your internal operations than an obligation of an insurer. At no point did the claimant's attorney ask us to use the authorization that they previously provided to get the records. The course of conduct in this claim was they were providing medical records. At some point, they omitted some medical records and we kept asking for them. They didn't say, hey, just use that authorization we gave you. They never said that. You know, so the course of dealings here is very important. Well, I'm not sure that they have some obligation to tell you which medical authorization to use because they've given you one, right? I mean, and I'm not sure the plaintiff's lawyer has any idea of whether you've got, it's stuck in a different file or in the UIM file. But the real question I've got, like in Missouri, do hospitals actually take two-year-old medical authorizations? I mean, that means it seems to me that, well, I mean, I spent a long time since I ruled about 12 months where all the hospitals and clinics just kept saying, yeah, find a new authorization because this one's stale. That was my next point, Your Honor. And the basis for that is, first of all, HIPAA and the authorizations, these medical providers are not taking old authorizations. The authorization said it was valid for this claim, all right, which is the MedPay claim. And so to go out and try to use that authorization that was three years stale for a MedPay claim could have exceeded the authority for which, you know, the claimant had provided it to us under. And so it didn't seem like a realistic option. Mr. Kiles testified as much, you know, in his deposition as to, you know, he said, yeah, I guess I could have went in that file, but they wouldn't have honored it. And we probably wouldn't have used it without authority from them to reuse it for something. So it just wasn't a realistic option in my view. But to submit to an EUO, separate reason, failure to produce documents, separate reason, or the medical authorization, separate reason. So if the court, the court can still uphold the, you know, the trial court's summary judgment grant, if it just determines that as a matter of law, they didn't submit to the examination under oath that was requested. And disregarding these, you know, if the court believes there are some type of issues regarding an authorization and medical records. However, I do think that they, there's nothing in the policies that says that, you know, just because you submit the authorization, you have no duty to provide any other documents. They still have that separate duty to provide documents under the policy. Counsel, one last question. And that is what, what was the prejudice to the insurer on all these facts? I mean, if the litigation proceeds, wouldn't you be able to essentially obtain compliance through a deposition? Exactly. So your honor, in the Roller case, which is the court of appeals case we just talked about, which is the most recent American modern, they said that this argument is unpersuasive because Missouri courts have consistently held that compulsory discovery in a lawsuit is no substitute for an insured's original cooperation. A quote, a deposition does not satisfy the insured's obligation under the policies to submit for an exam, examination under oath, for example. So the law in Missouri is completely clear that you can't say, well, we didn't cooperate pre-suit, but now that it's in suit, here's your authorization. Here's your deposition. Everything's fine. We didn't do anything wrong. It's the exact opposite of that. Actually, the insurance company has the right to obtain this information, to evaluate its exposure without having to litigate a case, pay defense costs, you know, enter and answer all of those things. And so, you know, litigation discovery is no substitute for an insured's obligation under the policy. Thank you, Mr. Wolf. All right. Thank you. I don't see any other questions. Mr. McHugh, your rebuttal. Yes, sir, your honor. With respect to this authorization, you're exactly right. They could have used that authorization. They never used it. Judge Erickson, to your point, there is no hard and fast rule about a year or two years. In fact, the one Mr. Wolf sent to me wanting the exact same stuff says it's good for three years. The CFR that cited in our reply brief in the summary judgment motion says that the authorizations remain good for the life of the claim or the event at issue. This was a bodily injury claim. It arguably then gave rise to various coverage parts, one of which was the MedPay claim, another of which was the UIM claim, could have even been UM, potentially liability. Who knows if the other lady said she got hurt. The farmer's underwriting materials, strike that, claims handling materials, some of which is a big secret, it's in the sealed part of the record, says what the authorization itself says, which is it can be used by everybody, which makes perfectly good sense. An insurance company gets one set of records and everybody that's handling the claim, no matter what the coverage parts, can go to those records. Ken Kyle reluctantly admitted that when I took his deposition, this business about didn't give him Dr. Ming's records, they didn't ask for them. We gave them what we had. How in the world will we know what he wanted if he wanted something different? Mind you, I sent him a letter and said, do you have everything you need? I highlighted red lines, is this all? He wrote me back and said, yes. How in the world am I supposed to know he actually needs something else? They have not yet told you, here we are at the end of oral argument, what it was they wanted. The business about the in-camera, you know what? That thing was fully briefed in March of 2017. We didn't have a ruling on it. We never got to see that file. That's because these guys said, oh, well, it was a palpable threat of litigation. Yet their papers say, well, the reason we sent it out to a Judge Sachs, he didn't let us see that because they said when the claim got filed, while we were scared, you were going to sue us. And then his reasoning and his deposition was, oh, I sent this out to my lawyers because of your demand. I was scared you were going to sue us. So I said the same thing twice at either end and got away with it. And there were no continued settlement negotiations after our time-limited demand expired. The district court's decision about that is wrong and Mr. Wolf's representation to you to the contrary is wrong. It is not in the record, which is permeated by factual disputes. Thank you. Thank you, Mr. Wolf. Mr. McHugh, the court appreciates both counsel's presence before the court this morning in the argument that you presented and the briefing that has been submitted and will take the case under advisement. Counsel may be excused.